# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-3156

_____

Ron Golan; Dorit Golan, individually and on behalf of all others similarly situated

*Appellants*

v.

FreeEats.com, Inc., doing business as ccAdvertising; AIC Communications, LLC, doing business as ccAdvertising; James R. Leininger

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - Eastern Division

_____

Submitted: December 12, 2018
Filed: July 16, 2019

_____

Before SMITH, Chief Judge, WOLLMAN and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

Dr. James R. Leininger, through his business that invests in family-friendly entertainment, helped finance *Last Ounce of Courage*, a film with religious and political themes. The firm responsible for marketing the film hired ccAdvertising to conduct a telephone marketing campaign. In conducting the campaign, ccAdvertising

made around 3.2 million phone calls in the course of a week. The named plaintiffs in this class action (the Appellants here), who received two answering machine messages, sued numerous parties involved with the film and marketing campaign for violating the Telephone Consumer Protection Act (TCPA). At issue in this appeal is whether the Appellants have standing based on the receipt of these two messages, whether the district court[1] abused its discretion by refusing to give one of the Appellants' requested jury instructions on Dr. Leininger's personal liability, and whether the district court erred by finding the statutory damages against ccAdvertising to be unconstitutional and reducing them from $500 per call ($1.6 billion total) to $10 per call ($32 million total). We conclude the Appellants have standing and affirm the district court.

## I. Background

The film *Last Ounce of Courage* involved the themes of "faith, freedom, and taking a stand for American values." Courage 2012, LLC, was formed to manage the ownership of the rights to the film. Enthuse Entertainment, an entity owned by Dr. Leininger that invests in family-friendly entertainment businesses, invested around $10 million to become a 2/3 owner of Courage 2012.

Courage 2012 hired Veritas Marketing Group to market and distribute *Last Ounce of Courage*, which in turn hired ccAdvertising,[2] a telemarketer in the political arena, to conduct a telephone campaign to promote the film. The owner of ccAdvertising, Gabriel S. Joseph, III, wrote a script for the telephone campaign and sent it to former Arkansas Governor Mike Huckabee, who agreed to record it.

---

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

[2]ccAdvertising is the name under which AIC Communications, LLC and FreeEats.com, Inc., do business.

In early September 2012, ccAdvertising conducted the telephone campaign using Governor Huckabee's recorded message. The phone calls were formatted as a poll, with questions on such topics as "American freedom and liberty" and "religious freedom." After hearing two polling questions, the call recipients were then asked if they would like to hear more about *Last Ounce of Courage*, which they could opt into with a "yes" response. Those who opted in heard the following message:

> Thank you for your interest. *Last Ounce of Courage* opens in theaters on Friday, September 14th. *Last Ounce of Courage* will inspire you and your loved ones to celebrate our nation and the sacrifices made to protect our liberties. It is a great story about taking a stand for religious freedom. The film is a timely reminder of all that is worth defending in our nation. Experience the *Last Ounce of Courage* trailer and see audience reactions at www.lastouncethemovie.com, that's lastouncethemovie.com.

The phone calls were sent to phone numbers ccAdvertising already possessed. ccAdvertising apparently believed the calls did not violate the TCPA because it had prior consent from these recipients to be contacted about topics such as religious liberty. During the week-long course of the campaign, 3,242,493 phone calls were made.

Among the recipients were Ron and Dorit Golan, who received two phone calls, but did not answer either one. They received two answering machine messages, saying: "Liberty. This was a public survey call. We may call back later."

In October 2012, the Golans filed a class action in Missouri state court. As later amended, the complaint asserted a cause of action under the TCPA and named numerous parties involved with the film and its marketing as defendants, including ccAdvertising, Joseph, and Dr. Leininger.

In May 2014, the district court dismissed the case, concluding that the Golans lacked standing because the messages they received did not violate the TCPA. A panel of this court reversed, concluding that even the brief messages qualified as "telemarketing" in violation of the TCPA because their underlying purpose was to promote a product or service. *See Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 818–21 (8th Cir. 2015).

The case eventually proceeded to trial in August 2017. The Golans' pre-trial proposed jury instructions did not seek to hold Dr. Leininger directly liable but sought liability under an agency theory. Similarly, in the Golans' pre-trial brief, they stated that they had enough evidence to hold ccAdvertising and Joseph directly liable and that "[t]he liability of the remaining defendants rests on principals [*sic*] of agency and ratification."[3] But midway through trial, the Appellees accused the Golans of shifting their theory of liability to also pursue a direct liability theory against Dr. Leininger.

At the close of evidence, the district court granted the Golans' motion for judgment as a matter of law against ccAdvertising.

The next day, the district court held a jury instruction conference to discuss the court's proposed jury instructions, which it explained would "not necessarily be the final instruction package." They included instructions regarding Dr. Leininger under both direct and agency liability theories. The court's proposed direct liability instruction required the Golans to prove both that ccAdvertising was acting as the agent of Courage 2012 and that Dr. Leininger, as an officer of Courage 2012, "had direct, personal participation in or personally authorized the conduct of ccAdvertising found to have violated the TCPA."

---

[3]Before the case was submitted to the jury, the Golans declined to pursue a ratification theory of liability against any defendants.

-4-

At the beginning of the conference, the Golans moved to voluntarily dismiss their claims against Courage 2012 and two other defendants. They explained that this dismissal was based on not getting the instruction they wanted with regard to Dr. Leininger: "In terms of the instructions that Your Honor has prepared in terms of the direct participation, not the agency but the direct participation, based on how the Court is having us submit those claims, we made a decision based on that to dismiss those parties." The court asked: "Do you understand these are not necessarily, as I mentioned, the final instructions? Would your actions be different if the proffered instructions were modified?" to which the Golans answered "I don't know at this point, Your Honor." The Golans also abandoned the direct liability theory against Dr. Leininger, instead "only submitting an agency theory, [with] Dr. Leininger as the principal, ccAdvertising as the agent." The district court granted the motion to voluntarily dismiss certain defendants. The district court also agreed to put the Golans' proposed instruction on direct liability in the record, which stated in relevant part:

> In addition to agency, an individual may be held personally or individually liable for violations of the TCPA if the individual:
>
> (1) had direct, personal participation in the conduct found to have violated the TCPA, OR
>
> (2) personally authorized the conduct found to have violated the TCPA.
>
> . . . .
>
> . . . [T]he personal liability of an individual must be founded upon his active oversight of, or control over, the conduct that violated the TCPA, rather than merely tangential involvement. Involvement is "tangential" if it is routine, passive or ministerial.

-5-

The individual must have knowledge that he is directly participating in or authorizing the telephone calls found to have violated the [TCPA], but he need not know that the conduct violates the TCPA. Whether the individual knows that the conduct violates the TCPA is not relevant to your consideration.

. . . .

The court wrote the following note on the Golans' requested instruction:

Tendered by plaintiffs. Plaintiffs would submit this instruction if the court would accept plaintiffs' view of the law. The court offered the instruction [that] there is corporate shield protection which plaintiff[s] believe is an erroneous interpretation of the law.
Refused. 8/15/17

After the Golans declined to submit a direct liability theory against Dr. Leininger, the only theory presented to the jury was the agency theory. The jury returned a verdict in favor of Dr. Leininger and the other defendants. The district court entered judgment against ccAdvertising based on its prior grant of the Golans' motion for judgment as a matter of law. The court entered judgment in favor of the remaining defendants.

ccAdvertising filed a post-trial motion for reduction of damages, arguing the statutory damages of $500 per call for 3,242,493 calls — totaling $1,621,246,500 — was so excessive it violated the Due Process Clause of the Fifth Amendment. The district court concluded that the $1.6 billion award was "obviously unreasonable and wholly disproportionate to the offense" and reduced the damages to $10 per call for a total of $32,424,930.

The Golans appealed the judgment, specifically challenging the district court's refusal to give their requested jury instruction on direct liability and its reduction of damages.

## II. Analysis
### A. Standing

We previously concluded the Golans have Article III standing to bring the TCPA claim. *See Golan*, 788 F.3d at 818–21. Under the law of the case doctrine, we normally do not revisit decisions of law decided at earlier stages of the same case. But there is an exception to that rule "when an intervening decision from a superior tribunal clearly demonstrates the law of the case is wrong." *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 610 (8th Cir. 1999) (quoting *Morris v. American Nat'l Can Corp.*, 988 F.2d 50, 52 (8th Cir. 1993)); *see also* Bryan A. Garner et al., *The Law of Judicial Precedent* 483–85 (2016). An indispensable requirement for Article III standing is that "the plaintiff must have suffered an 'injury in fact.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Our prior statement that "[i]njury in fact may thus be shown 'solely by the invasion of a legal right that Congress created,'" *Golan*, 788 F.3d at 819 (quoting *Hammer v. Sam's East, Inc.*, 754 F.3d 492, 498 (8th Cir. 2014)) is no longer good law in light of the Supreme Court's subsequent holding in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) ("Article III standing requires a concrete injury even in the context of a statutory violation."). We thus revisit[4] our prior holding but conclude that, even under *Spokeo*, the Golans suffered a concrete injury and thus have standing.[5]

---

[4]We grant ccAdvertising's motion to supplement the record that was filed in connection with the supplemental briefing we ordered on standing.

[5]The certified class was defined as all persons to whom the defendants initiated the calls at issue here. We conclude only that the Golans, the named plaintiffs, have

The *Spokeo* opinion clarified that the requirements that an "injury in fact" be "concrete" and "particularized" are separate inquiries. *Id.* at 1548. That case involved an alleged violation of the Fair Credit Reporting Act based on the listing of incorrect information about the plaintiff online. *See id.* at 1544–45. The alleged violation was particularized (because the incorrect information related to the plaintiff in particular) but the Supreme Court remanded for a determination of whether the violation was concrete. *See id.* at 1548–50.

The *Spokeo* opinion explained that for an injury to be concrete, it must be "'real' and not 'abstract.'" *Id.* at 1548 (quoting Webster's Third New International Dictionary 472 (1971)). A plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. . . . [A plaintiff cannot,] for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* at 1549. But the Court clarified that this does not rule out all intangible injuries — even "intangible injuries can nevertheless be concrete." *Id.*

standing. We do not consider whether the significant portion of absent class members who neither answered the call nor received answering machine messages would have standing — a group that is likely based in part on calls that rang while no one was home or calls to disconnected phone numbers. *See Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019) ("[F]ederal courts lack jurisdiction if no named plaintiff has standing."); *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017) ("A putative class action can proceed as long as one named plaintiff has standing."). None of the defendants have cross-appealed to challenge the certification of the class to include the recipients of calls that never connected with a person or answering machine. *See Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 377 (8th Cir. 2018) ("[A] class must be defined 'in such a way that anyone within it would have standing.'" (quoting *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010))).

-8-

At issue here is whether the intangible injury claimed by the Golans — the receipt of two answering machine messages — is a concrete injury. The Supreme Court in *Spokeo* instructed that "[i]n determining whether an intangible harm constitutes an injury in fact, both history and the judgment of Congress play important roles." *Id.* Conduct that is actionable under the TCPA has, of course, been identified as a cognizable injury by Congress. This is not dispositive, but is relevant to whether such conduct creates a concrete injury. *See Spokeo*, 136 S. Ct. at 1549.

"Because the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice," courts should "consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* An alleged harm need not actually have been actionable at common law to satisfy this inquiry, rather it must have a "close relationship" to the type of harm that has traditionally been recognized as actionable. *See Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017) (discussing *Spokeo*, 136 S. Ct. at 1549).

The harm to be remedied by the TCPA was "the unwanted intrusion and nuisance of unsolicited telemarketing phone calls and fax advertisements." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017). The harm here was the receipt of two telemarketing messages without prior consent. These harms bear a close relationship to the types of harms traditionally remedied by tort law, particularly the law of nuisance. *See id.* at 1043–44; *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85 (2d Cir. 2019); *Susinno*, 862 F.3d at 350–52. It is not dispositive whether unsolicited telephone calls are actually actionable under any common law tort because "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *Spokeo*,

136 S. Ct. at 1549 (alteration in original) (quoting *Lujan*, 504 U.S. at 578). Nor does it matter that the harm suffered here was minimal; in the standing analysis we consider the nature or type of the harm, not its extent. *See generally id.* We thus conclude the Golans suffered a concrete injury and have standing.

## B. Jury Instruction

The Golans argue the district court abused its discretion by refusing to give the jury their preferred instruction on direct liability against Dr. Leininger.[6] We disagree.

"We review for abuse of discretion a court's jury instructions." *Wurster v. Plastics Grp., Inc.*, 917 F.3d 608, 614 (8th Cir. 2019). For an appellant to prevail when challenging the denial of a proposed jury instruction, "the proposed instruction must (1) correctly state the applicable law; (2) address matters not adequately covered by the charge; and (3) involve a point 'so important that failure to give the instruction seriously impaired the party's ability to present an effective case.'" *Id.* (quoting *Cox v. Dubuque Bank & Tr. Co.*, 163 F.3d 492, 496 (8th Cir. 1998)). Moreover, the tendered instruction must be "warranted by the evidence." *Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 389 (8th Cir. 2016).

The district court did not abuse its discretion by refusing to give the Golans' requested instruction on Dr. Leininger's direct liability under the TCPA. The Golans are correct that establishing liability against a business is not a prerequisite to finding an officer (or employee) of that business liable. Nevertheless, they were not entitled

---

[6]While it appears the Golans likely waived this argument by refusing to submit the direct liability theory to the jury, *see Galena v. Leone*, 638 F.3d 186, 200 (3d Cir. 2011); *cf. Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011), we need not decide that issue because the Golans' argument fails on the merits.

to their instruction because it did not "correctly state the applicable law." *Wurster*, 917 F.3d at 614. The proposed instruction articulated too loose a standard for direct liability and blurred the line between direct and agency liability. And there was also insufficient evidence to give an instruction regarding Dr. Leininger under a correctly articulated direct liability theory.

The TCPA prohibits, among other things, "initiat[ing] any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party," subject to certain exceptions including where the call "is exempted by rule or order by the [Federal Communications] Commission [(the "FCC")[7]]." 47 U.S.C. § 227(b)(1)(B). The FCC has exempted calls "made for a commercial purpose but [which do] not include or introduce an advertisement or constitute telemarketing." 47 C.F.R. § 64.1200(a)(3)(iii). A prior panel of this court held the messages at issue here, while possibly not "advertisements," did constitute "telemarketing" because their purpose was to promote *Last Ounce of Courage*. *See Golan*, 788 F.3d at 819–20.

The scope of direct liability is determined by the statutory text. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 543 (2019); *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1721 (2017). The TCPA makes it "unlawful for any person . . . to initiate any telephone call" that violates its relevant prohibitions. § 227(b)(1)(B). Thus, to be held directly liable, the defendant must be the one who "initiates" the call. Neither the TCPA nor the FCC rules define the term "initiate." *See In re Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6583 (2013). But the FCC has

---

[7]The FCC is authorized by the TCPA to exempt calls "not made for a commercial purpose" as well as calls made for a commercial purpose that "will not adversely affect . . . privacy rights" and "do not include . . . any unsolicited advertisement." 47 U.S.C. § 227(b)(2)(B).

concluded that "a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call." *Id.* This "generally does not include persons or entities, such as third-party [entities on whose behalf the call is made], that might merely have some role, however minor, in the causal chain that results in the making of a telephone call." *Id.* The FCC said direct TCPA liability in this context generally does not extend to sellers who do not personally make the phone calls at issue, but only includes the telemarketers acting on behalf of those sellers. *See id.* We agree.[8]

Direct liability under the TCPA does not depend on one's status as a corporate officer (or employee). The text of the TCPA makes no distinction between individuals who initiate calls in their personal capacities and those who do so in their capacities as corporate officers. *See* § 227(b)(1)(B). Rather, the statute simply makes it unlawful for "any person" to make prohibited calls. § 227(b)(1). In the portion of the TCPA creating a private cause of action, the TCPA does not specify against whom the action may be brought. *See* § 227(b)(3). In the analogous context of tort law, individuals are generally liable for any torts they commit, even those committed in the scope of their employment or in their role as corporate officers. *See Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001). Nor does the TCPA require that an officer's business be found liable before the officer may be held liable,

---

[8]Our decision is not impacted by the recent Supreme Court opinion in *PDR Network, LLC, et al. v. Carlton & Harris Chiropractic, Inc.*, __ S.Ct. __ (2019). We agree with the FCC not because we believe we are bound to do so but because we find this portion of their interpretation of the statute to be persuasive.

as the defendants argued here.[9]  Simply put, "any person" who violates the TCPA may be liable.  § 227(b)(1).

But as will be explained below, the Golans' proposed instruction improperly blurred the line between direct and agency liability.  Under an agency theory of liability, a party may be held liable even if he or she does not "initiate" the violating call, but the direct violator acts as the party's agent.[10]  *See Meyer v. Holley*, 537 U.S. 280, 285 (2003); Dan B. Dobbs et al., *The Law of Torts* § 425 (2d ed. 2019); Restatement (Third) Of Agency § 1.01 (2006).  "[W]hen Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules," *Meyer*, 537 U.S. at 285, and such background legal principles apply unless the statute's text or context indicate otherwise.  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011) ("[W]hen Congress creates a federal tort it adopts the background of general tort law.").

---

[9]While establishing liability against a business is not a prerequisite for establishing the liability of its officer (or employee), the business may be liable for the officer's TCPA violation under a respondeat superior agency theory.  *See* Dan B. Dobbs et al., *The Law of Torts* §§ 425–29 (2d ed. 2019).  Thus, it is true there can be a potential risk of inconsistent verdicts in cases where a plaintiff sues both the officer and the business, but this does not mean establishing liability against the business is a prerequisite to the officer's liability.

[10]Relevant to this case, where a business entity's officer (or employee) acts on behalf of the business to create an agency relationship with a direct violator, the agency relationship is between the direct violator and the business — not between the direct violator and the officer, unless the officer created the agency relationship in his or her personal capacity (and not on behalf of the business).  *Cf.* Restatement (Third) Of Agency §§ 1.01, 6.01.  Thus, to the extent Dr. Leininger was acting in his capacity as an officer of Enthuse or Courage 2012, and not in his personal capacity, he created (if any) an agency relationship between ccAdvertising and Enthuse or Courage 2012, not between ccAdvertising and himself.

The Golans' instruction did not accurately state the law because it would allow direct liability even where the defendant did not "initiate" the calls. § 227(b)(1)(B). It would have allowed the jury to find Dr. Leininger *directly* liable based on "direct, personal participation," defined as "active oversight of, or control over" the TCPA violation, or if he "personally authorized" it. But to be held directly liable, a person must actually "initiate" the offending phone call, meaning the person "takes the steps necessary to physically place a telephone call." *In re Dish Network*, 28 F.C.C. Rcd. at 6583; *see also* § 227(b)(1)(B). The Golans' instruction does not "correctly state the applicable law," *Wurster*, 917 F.3d at 614 (quoting *Cox*, 163 F.3d at 496) because it would stretch the liability imposed by the TCPA beyond the bounds of those who "initiate" the phone call. Of course, an individual like Dr. Leininger, if acting in his personal capacity, could potentially be held liable for the authorization, oversight, and control of conduct violating the TCPA under an agency theory. But the district court separately gave an adequate jury instruction regarding agency liability, an instruction the Golans do not challenge on appeal. *See W. Plains, L.L.C. v. Retzlaff Grain Co. Inc.*, 870 F.3d 774, 792 (8th Cir. 2017) ("A party 'is not entitled to a particularly worded instruction.'" (quoting *Retz v. Seaton*, 741 F.3d 913, 919 (8th Cir. 2014))).

Further, the evidence did not warrant instructing the jury regarding Dr. Leininger on a correctly understood direct liability theory. The Golans argue to the contrary because they claim he hired the direct violator, was involved in editing the call script, obtained Governor Huckabee to record the script, and approved and paid for the calls. Again, while such facts could show a significant level of control that might be sufficient to establish liability under an agency theory if he was acting in his personal capacity (though the jury rejected the Golans' agency theory at trial), *see* Restatement (Third) of Agency § 1.01, they do not show Dr. Leininger actually initiated the calls. Only Joseph and ccAdvertising, who made the calls at issue here, initiated the calls by "tak[ing] the steps necessary to physically place [the] telephone call[s]." *In re Dish Network*, 28 F.C.C. Rcd. at 6583; *see also* § 227(b)(1)(B). The

district court did not abuse its discretion by refusing to give the Golans' requested instruction.

## C.  Reduction of Statutory Damages

The Golans argue the district court erred by reducing the award of statutory damages against ccAdvertising.  We disagree.

As a threshold matter, we agree with the Golans that nothing in the relevant provision of the TCPA itself — which provides for recovery of "actual monetary loss" or "$500 in damages" per violation, whichever is greater — allows for the reduction of statutory damages.  § 227(b)(3)(B).  As they correctly argue, "$500 means $500."  A separate provision of the TCPA allows damages of "*up to* $500 in damages" per violation, illustrating well that Congress knows how to create flexibility in statutory damages, but did not do so here.  § 227(c)(5)(B) (emphasis added).  Thus, statutory damages under § 227(b)(3)(B) may only be reduced if the award would be unconstitutional.

The Supreme Court long ago held that a penalty assessed pursuant to a statute violates the Due Process Clause if it is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919).  More recently, we affirmed that this standard is still good law. *See Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 907 (8th Cir. 2012).  While courts may review for constitutionality, states and Congress "still possess a wide latitude of discretion in" setting statutory penalties and damages. *Williams*, 251 U.S. at 66.

We review de novo[11] the district court's legal determination that the TCPA-mandated statutory damages of $1.6 billion would violate the Due Process Clause. *Cf. Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 435–36 (2001) (concluding that "courts of appeals should apply a de novo standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards").[12] The underlying facts are not in dispute.

We agree with the district court that the statutory damages here of $1.6 billion violate the Due Process Clause. To state the obvious, $1.6 billion is a shockingly large amount. Compare that to the conduct of ccAdvertising. It plausibly believed

---

[11]The Golans challenge the district court's conclusion that the statutory damages ($500 per call, equaling $1.6 billion) would violate the Due Process Clause, and do not argue in the alternative that the reduced amount awarded by the district court ($10 per call, equaling $32 million) should have been more (but less than the statutory amount). Thus, we only address the standard of review for the district court's conclusion on the Due Process Clause issue. A district court's decision of what alternative amount to award may well call for a more deferential standard of review, an issue we need not reach here.

[12]We have not previously determined the proper standard of review for determinations of the constitutionality of statutory damages. It is true in one case involving such a review we stated that "damages awarded under the Copyright Act [are reviewed] for clear error," citing a case that articulated the standard of review for *actual damages* in a copyright case. *See Warner Bros. Entm't v. X One X Prods.*, 840 F.3d 971, 977 (8th Cir. 2016) (citing *Pfanenstiel Architects, Inc. v. Chouteau Petroleum Co.*, 978 F.2d 430, 432 (8th Cir. 1992)). But this case is not a copyright case nor does it involve actual damages. Thus, we rely on the closest analogous circumstance, review of the constitutionality of punitive damages, to conclude de novo review is applicable. The substantive standards for review of punitive damages and statutory damages under the Due Process Clause are different, *see Capitol Records*, 692 F.3d at 907–08, but they are analogous for purposes of the standard of review.

it was not violating the TCPA.[13] It had prior consent to call the recipients about religious liberty, and a predominant theme of *Last Ounce of Courage* is religious liberty. Moreover, only the recipients who voluntarily opted in during the call heard the message about the film. The call campaign was conducted for only about a week. And the harm to the recipients was not severe — only about 7% of the calls made it to the third question, the one about the film. Under these facts, $1.6 billion is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *Williams*, 251 U.S. at 67.

The Golans argue that we may not consider the aggregate award here, but only the amount per violation. But this argument is plainly foreclosed by our precedents. *See Capitol Records*, 692 F.3d at 910 ("The absolute amount of the award, not just the amount per violation, is relevant to whether the award is 'so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.'" (quoting *Williams*, 251 U.S. at 67)); *see also Warner Bros. Entm't v. X One X Prods.*, 840 F.3d 971, 977 (8th Cir. 2016) (same). We are unpersuaded by the Golans' attempt to distinguish *Capitol Records* on the basis that there was only one plaintiff there, whereas there are multiple plaintiffs in the class here. The aggregate award is still relevant. The district court did not err in concluding the statutory damages would violate the Due Process Clause and reducing the award.

---

[13]We note that ccAdvertising has not cross-appealed to argue that its dual purpose calls (having both political and commercial purposes) do not qualify as advertisements, that the recipients' consent to calls regarding religious liberty included consent to calls regarding a commercial film relating to religious liberty, or that the opt-in prior to the information about the film supplied the necessary consent. Thus, we express no opinion on the merits of such arguments.

## III.  Conclusion

For the reasons set forth herein, we affirm.

_____