# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-3612
_____

Marcia Denmon

*Plaintiff - Appellee*

v.

Kansas Counselors, Inc.

*Defendant - Appellant*

------------------------------

Missouri Creditors Bar, Inc.

*Amicus on Behalf of Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: January 14, 2025
Filed: August 13, 2025
_____

Before LOKEN, ARNOLD, and KELLY, Circuit Judges.
_____

LOKEN, Circuit Judge.

The Fair Debt Collection Practices Act (FDCPA) provides that "[i]f a consumer notifies a debt collector in writing . . . that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt." 15 U.S.C. § 1692c(c). On June 30, 2021, Missouri consumer Marcia Denmon brought this action against debt collector Kansas Counselors, Inc. (KCI), alleging three separate violations of the FDCPA in three counts. On September 27, Denmon filed an Amended Complaint asserting one violation, that KCI violated § 1692c(c) when it mailed her a collection letter verifying the debt she owed after Denmon sent a fax to KCI saying, "I dispute this debt. Please do not contact me about this debt."

On March 9, 2022, the parties filed cross-motions for summary judgment based on stipulated facts. Relying on the Supreme Court's decision in TransUnion LLC v. Ramirez, 594 U.S. 413 (2021), KCI argued that Denmon suffered no tangible injury and therefore could not satisfy her burden to establish Article III standing. Denmon argued, and the district court agreed, that she alleged a sufficient actual injury because the single, unwanted letter sent by KCI "intruded upon her seclusion and invaded her privacy." The court further concluded that KCI's letter violated § 1692c(c), granted Denmon's motion for summary judgment, entered Judgment in a Civil Case, and then denied KCI's motion for reconsideration of its standing decision. On November 6, 2023, the court granted Denmon's motion for entry of an award of damages of $1,000 and set a briefing schedule on a motion to award attorneys' fees. On December 20, the court entered a Stipulated Final Judgment after the parties agreed to an additional award of $60,000 in costs and attorneys' fees. See 15 U.S.C. § 1692k. KCI appeals, challenging the district court's ruling that Denmon suffered an injury in fact and therefore has standing. Reviewing the district court's standing determination *de novo*, we reverse. Bassett v. Credit Bureau Servs., Inc., 60 F.4th 1132, 1134 (8th Cir. 2023) (standard of review).

# I. Article III Standing.

To establish Article III standing, which limits federal judicial authority to the resolution of "cases and controversies," as the Constitution requires, Denmon must show "(i) that [s]he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by [KCI]; and (iii) that the injury would likely be redressed by judicial relief." TransUnion, 594 U.S. at 423 (citation omitted). The issue in this case, as in TransUnion, is the requirement that Denmon's injury in fact be "concrete" -- that is, "real, and not abstract." Id. at 424, quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016).

"To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm. No concrete harm, no standing." TransUnion, 594 U.S. at 417. In deciding this issue, "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." Id. at 424, quoting Spokeo, 578 U.S. at 341. "[T]raditional tangible harms, such as physical harms and monetary harms," readily qualify as concrete injuries under Article III. Id. at 425. Various intangible harms can also be concrete. "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." Id., citing Spokeo, 578 U.S. at 340. "Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." Id.

Denmon's Amended Complaint alleges that she suffered a concrete injury from the receipt of one unwanted letter that "resulted in a direct invasion of [her] legally-protected right to be left alone and her right to privacy . . . all of which upset, distressed and alarmed Ms. Denmon." In granting Denmon summary judgment on her § 1692c(c) claim, the district court, acknowledging conflicting authority, concluded that the alleged invasion of her legally-protected right to be left alone and

her right to privacy was a concrete and particularized harm that is closely related to the tort of invasion of privacy and intrusion upon seclusion.

"[T]he concrete harm inquiry is fact specific." Ojogwu v. Rodenburg Law Firm, 26 F.4th 457, 463 n.4 (8th Cir. 2022). "The party invoking federal jurisdiction bears the burden of establishing" he or she suffered a concrete injury. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). In general, allegations of intangible injury such as distress and alarm "fall short of cognizable injury as a matter of general tort law." Ojogwu, 26 F.4th at 463 (quotation omitted); see Pennell v. Glob. Tr. Mgmt., LLC, 990 F.3d 1041, 1045 (7th Cir. 2021) (holding that confusion and stress with no physical manifestations or medical diagnosis are not concrete injuries).

The phrase "intrusion upon seclusion" does not appear in Denmon's Amended Complaint. But intrusion upon seclusion is a well-recognized category of privacy invasion torts, which Denmon did allege, so the district court properly considered whether the "intrusion" injury alleged by Denmon would be actionable under the contours of that common law tort as set forth in the Restatement (Second) of Torts § 652B (1977). See Pucillo v. Nat'l Credit Sys., Inc., 66 F.4th 634, 640 (7th Cir. 2023); cf. Bassett, 60 F.4th at 1136 n.2. However, the court did not consider this fact-intensive issue in the context of the communications at issue.

## II. Denmon Lacks Article III Standing.

The stipulated facts establish that in November 2016, Denmon allegedly incurred a medical debt to Rockhill Orthopedic Specialists that qualifies as a consumer debt under § 1692a(5) of the FDCPA. The Amended Complaint alleges that "[d]ue to financial difficulties, [Denmon] was unable to pay her debts, including [the debt] allegedly owed to Rockhill." Rockhill turned the unpaid debt over to KCI for collection. In June 2017, "KCI sent an initial debt collection letter to Denmon." Section 1692g(a) provides:

-4-

Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall . . . send the consumer a written notice containing . . .

> (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt . . . the debt will be assumed to be valid by the debt collector;

> (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt . . . is disputed, the debt collector will obtain verification of the debt . . . and a copy of such verification . . . will be mailed to the consumer by the debt collector.

Section 1692g(b) provides that if the consumer notifies the debt collector that the debt is disputed within the thirty-day period:

> [T]he debt collector shall cease collection of the debt . . . until the debt collector obtains verification of the debt . . . and a copy of such verification . . . is mailed to the consumer by the debt collector.

The stipulation of facts recites that on March 30, 2021, almost four years after KCI's initial debt collection letter, Demon sent a letter to KCI, stating:

> I reviewed my credit report and discovered that you are reporting that I owe you $300 for a debt to Rockhill Orthopedic Specialists, Inc. I dispute this debt. Please do not contact me about this debt.

As this was the initial communication KCI received from Denmon after sending its initial debt collection letter, it is apparent that KCI had lawfully resumed debt collection efforts after the end of the thirty-day period following its initial letter, as the text of Denmon's letter confirms -- "I reviewed my credit report and discovered that you are reporting that I owe you $300 for a debt to Rockhill."

The stipulation of facts next recites that KCI sent Denmon a letter dated May 19, 2021, stating:

> We recently received your request for verification of your account with our office.
>
> In response to your request we are enclosing documents provided by our client which verify your debt.
>
> Now that your debt has been validated, we will resume collection activity on your account. We are always interested in assisting you in your efforts to resolve this matter.
>
> Please contact one of our representatives . . . and we will be happy to help you establish suitable arrangements.
>
> Sincerely,
> Kansas Counselors
>
> This communication is from a debt collector and is an attempt to collect a debt. Any information obtained will be used for that purpose.

In the summary judgment proceedings, the only evidence Denmon offered regarding her injury was that she received this one unwanted letter in the mail; that the letter sought to verify the debt she owed, offered assistance, and notified Denmon that KCI would resume its collection activities; and that there were no further communications between the parties.

KCI argues that Denmon's March 2021 communication that "the debt is disputed" was an untimely response to its 2017 initial debt collection letter under § 1692g(b) and therefore KCI did not violate § 1692c(c) by continuing its collection efforts in its May 2021 response. But that is an incomplete view of the legal landscape in early 2021. Title 15, Chapter 41 of the United States Code is titled Consumer

Credit Protection. The FDCPA, §§ 1692-1692p, is found in Subchapter V. Denmon's March 2021 fax was prompted by her review of "my credit report." It clearly triggered the provisions of Subchapter III, the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681-1681x.

The FCRA was first enacted in 1970, some years before the FDCPA. A bad credit rating can seriously affect a consumer's ability to obtain consumer debt on favorable terms. In the FCRA, Congress enacted complex regulatory requirements to ensure that credit reporting agencies (CRAs) and debt collectors like KCI who furnish credit information to CRAs "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the [consumer] report relates." § 1681e(b). The FCRA provides the consumer a right to obtain a copy of a consumer report from the CRA "upon request," § 1681g(a), and a right "to dispute information in the file of the consumer under section 1681i," § 1681g(c)(1)(B)(iii). If the consumer disputes the completeness or accuracy of any information in the report before the end of the 30-day period after the CRA received notice of the dispute from the consumer, the CRA or the person who furnished the disputed information to the CRA must reinvestigate the disputed information. §§ 1681i, 1681s-2(a)(8) and (b). Denmon's March 30, 2021 fax to KCI -- "I reviewed my credit report and discovered that you are reporting that I owe you $300 . . . I dispute this debt." -- was on its face a consumer notice disputing information in a credit report. It was not an untimely FCRA notice under § 1681, even if it was arguably untimely by nearly four years under § 1692c(c) of the FDCPA.

The FCRA does not have a "no contact" provision corresponding to § 1692c(c) of the FDCPA. And rightly so. The obligations of a debt collector who furnished information to a CRA and who receives a notice directly from the consumer disputing the accuracy of the information it furnished -- precisely the substance of Denmon's March 30, 2021 fax to KCI -- include conducting an investigation of the disputed information, completing its investigation of the dispute, *and reporting the results of*

*the investigation to the consumer* before the end of the period within which a consumer reporting agency would be required to report "if the consumer had elected to dispute the information under [§ 1681i(a)(1)]. § 1681s-2(8)(E)(iii). Thus, Denmon's March 30, 2021 fax imposed on KCI a *statutory duty* to respond to the fax directly to consumer Denmon. The paradox of imposing conflicting statutory obligations is obvious. As the Supreme Court observed in a case involving different FDCPA issues, "[w]e agree with Heintz that it would be odd if the Act empowered a debt-owing consumer to stop the 'communications' inherent in an ordinary lawsuit and thereby cause an ordinary debt-collecting lawsuit to grind to a halt." Heintz v. Jenkins, 514 U.S. 291, 296 (1995).

This paradox raises the question: why would Denmon add a "do not contact me about this debt" footnote to a letter complaining that KCI furnished false information to a CRA? The no-contact request was almost certain to be "violated" if KCI complied with its FCRA obligations. We do not know the answer because the case was decided in the district court without discovery. The author of the March 30, 2021 fax is unknown but was almost certainly a lawyer. The letter cited no legal authority in making inconsistent legal compliance demands under two consumer protection statutes that sit almost side-by-side in Chapter 41 of Title 15. If a "consumer protection" lawyer drafted this deceptive letter with the intent of trapping KCI in an indefensible FDCPA lawsuit, sanctions might be in order. In any event, we conclude the March 30, 2021 letter is not a valid basis for a § 1692c(c) claim.

Moreover, even if the § 1692c(c) claim is not facially invalid, Denmon lacks Article III standing under the governing TransUnion standards because Denmon did not suffer an intangible injury that has a "close relationship to harms traditionally recognized as providing a basis" for an intrusion upon seclusion lawsuit. 594 U.S. at 425. The traditional elements of the invasion-of-privacy tort known as intrusion upon seclusion are set forth in Restatement (Second) of Torts § 652B:

One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Here, KCI did precisely what the FCRA required -- it promptly investigated Denmon's complaint that it had inaccurately reported an invalid debt to a CRA and responded directly to Denmon that the debt was valid, providing the same documents verifying the debt that it would have provided under § 1692g(b) had Denmon timely disputed the debt in response to KCI's initial debt collection letter under the FDCPA. When considering whether "an intangible harm constitutes injury in fact, . . . the judgment of Congress [is] instructive." Spokeo, 578 U.S. at 331. Surely Congress would not intend such a result.

KCI's letter is not only beneficial, like the garnishment summons sent to the debtor in Ojogwu, 26 F.4th at 463-64, but it is mandated by the FCRA for the protection of consumers. Denmon's fax invited, indeed commanded this response. Where is the "intrusion" upon her solitude or seclusion? "[T]here is nothing inherently bothersome, intrusive, or invasive about a collection letter delivered via U.S. Mail," Pucillo, 66 F.4th at 460, particularly when the letter was mandated by the FCRA for Denmon's benefit. Even if unwanted, how could a reasonable jury find that this single, *invited response* "would be highly offensive to a reasonable person" who had not paid a valid debt for many years? "[R]eceipt of a letter alone may not be an intrusion that 'would be highly offensive to a reasonable person.'" Bassett, 60 F.4th at 1136 n.2, citing Restatement (Second) of Torts § 652B (1977). In the summary judgment proceedings, Denmon provided no evidence of *intentional* intrusion. "[A] defendant with a good faith belief that the conduct is authorized will not be liable for intrusion." Intrusion Form of Privacy -- Defining Intrusion, 1 Rights of Publicity and Privacy § 5:89 (2d ed), and cases cited.

Having provided no evidence of two of the main elements of intrusion upon seclusion, Denmon did not suffer a harm that has a sufficiently *close* relationship to this privacy tort. Without an intentional intrusion and conduct that is highly offensive to a reasonable person, there is no tort.

"Article III standing requires a concrete injury even in the context of a statutory violation." TransUnion, 594 U.S. at 426. Taking into account the full context of the two communications at issue in this case, we conclude Denmon failed to prove a concrete injury. Whether a plaintiff suffered concrete injury is a case-specific inquiry. Our holding is limited to the facts of this case.

For these reasons, the judgment of the district court is vacated and the case is remanded with instructions to dismiss the Amended Complaint.

KELLY, Circuit Judge, dissenting.

The Court determines that the harm Denmon alleges is not significant enough to confer standing in federal court. The conclusion has intuitive force; after all, receiving an unwanted letter, without more, does not seem particularly harmful. The intuition is even stronger in Denmon's case, where, as the Court points out, Denmon's letter both disputing her debt and asking not to be contacted appears to have subjected KCI to conflicting statutory obligations: requiring a response confirming the debt while simultaneously demanding the opposite. Slip Op. at 7–8. But as I see it, Denmon has nonetheless pleaded injury sufficiently analogous to common law privacy harms for purposes of Article III standing.

When assessing whether an injury is concrete for purposes of Article III standing, "we consider the nature or type of the harm, not its extent." Golan v. FreeEats.com, Inc., 930 F.3d 950, 959 (8th Cir. 2019). This distinction is neither new nor controversial. Take monetary harms: "For standing purposes, a loss of even a

-10-

small amount of money is ordinarily an 'injury.'" Czyzewski v. Jevic Holding Corp., 580 U.S. 451, 464 (2017). Even a paltry expense—like the cost of a postage stamp—poses *some* financial injury, and thus causes concrete harm for purposes of Article III. See, e.g., Ebaugh v. Medicredit, Inc., No. 24-1838, 2025 WL 1088077, at *1 (8th Cir. Apr. 11, 2025) (per curiam) (finding cost of a postage stamp and envelope conferred standing).

The same distinction between the type of harm and its extent applies when "analogiz[ing] to [intangible] harms recognized by the common law." Gadelhak v. AT&T Servs., Inc., 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (noting that in assessing whether intangible harms are concrete under Article III, "we are meant to look for a 'close relationship' in kind, not degree" (quoting Spokeo, 578 U.S. at 341)). In turn, we have acknowledged that "[m]ost circuits . . . conclude[] that a consumer debtor has Article III standing to assert an FDCPA claim that a debt collector's harassing calls or letters invaded a privacy interest protected by the well-established tort of 'intrusion upon seclusion.'" Ojogwu, 26 F.4th at 463 n.4 (first citing Restatement (Second) of Torts § 652B; then citing Lupia v. Medicredit, Inc., 8 F.4th 1184, 1191 (10th Cir. 2021); and then citing Gadelhak, 950 F.3d at 461–63). At common law, the tort of intrusion upon seclusion made liable "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977). Intrusion upon seclusion vindicates a privacy right recognized by the common law. See id. § 652A. As the Second Restatement explains, "[t]he right of privacy has been defined as the right to be let alone," id. cmt. a, such that each tort under the right-to-privacy umbrella "involves interference with the interest of the individual in leading, to some reasonable extent, a secluded and private life, free from the prying eyes, ears and publications of others," id. cmt. b.

-11-

Against this backdrop, I would conclude that Denmon's FDCPA claim reflects a harm analogous to intrusion upon seclusion. She told KCI to stop contacting her, and, despite receiving Denmon's request, the organization contacted her anyway.[1] The receipt of an unwanted letter is intrusive, even if minimally so; after all, it is unwanted. So, KCI's action exacted some, even if slight, "interference with [Denmon's] interest in leading . . . a secluded and private life, free from the . . . publications of others." Id. In my view, Denmon has thus pleaded a harm similar in kind to one recognized at common law. See Gadelhak, 950 F.3d at 462–63; Lupia, 8 F.4th at 1192 ("Though a single phone call may not intrude to the degree required at common law, that phone call poses the same *kind* of harm recognized at common law—an unwanted intrusion into a plaintiff's peace and quiet.").

The Court finds that KCI's letter did not suffice to concretely injure Denmon because its intrusion was neither "intentional[]" nor "highly offensive to a reasonable person," as would be required to state a common law claim for intrusion upon seclusion. Slip Op. 10; see Restatement (Second) of Torts § 652B. But for purposes of Article III standing, "[i]t is not dispositive whether unsolicited [missives] are *actually* actionable under any common law tort." Golan, 930 F.3d at 959 (emphasis added); see also Gadelhak, 950 F.3d at 463 (holding that "[a] few unwanted automated

---

[1]The Court finds otherwise, "conclud[ing]" that Denmon's "March 30, 2021 letter is not a valid basis for a § 1692c(c) claim" because the letter may have triggered KCI's response obligation under the FCRA. Slip Op. 8. On this view, Denmon's letter actually "invited, indeed commanded [a] response" under the FCRA, so it could not have intruded upon her seclusion. Id. at 9. But any separate obligation KCI had under FCRA is not at issue here. See Turtle Island Foods, SPC v. Thompson, 992 F.3d 694, 699 (8th Cir. 2021) (noting that a court "must address questions of standing before addressing the merits," and that "[i]t is crucial . . . not to conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action" (citations omitted)). Relevant for the standing analysis, Denmon received an unwanted letter from KCI. Whether KCI had a separate obligation to send Denmon that letter does not alter the fact that KCI intruded upon her seclusion.

-12-

text messages" posed a concrete harm because, despite "be[ing] too minor an annoyance to be actionable at common law," they "pose[d] the same *kind* of harm that common law courts recognize").

Indeed, in determining whether Denmon's harm is of a similar kind to intrusion upon seclusion, the intent of the defendant and the degree of the harm are not relevant.

First, intentionally or not, KCI sent an unwanted letter and thus "interject[ed] itself into [Denmon's] private sphere," "implicat[ing] [her] common-law right to seclusion—that is, [the] right to be left alone from others." Dickson v. Direct Energy, LP, 69 F.4th 338, 345 (6th Cir. 2023) (finding a single, unwanted ringless voicemail conferred standing); cf. TransUnion, 594 U.S. at 417, 432–33 (finding "reputational harm" sufficient for standing where a credit reporting agency "provided misleading credit reports to third-party businesses," even though the reports were "not *literally* false" as would be required for a defamation claim at common law (emphasis added) (citing Restatement (Second) of Torts § 558 (1938))).

Second, it is true that the letter Denmon received appears to be less "offensive" than other potential intrusions—she did not endure ringing, knocks at her door, or buzzing in her pocket. But even assuming that is the case, "the fact that [KCI] sent only one letter does not change the *kind* of harm caused." Six v. IQ Data Int'l, Inc., 129 F.4th 630, 634 (9th Cir. 2025) (finding the receipt of a single unwanted letter was sufficient to confer Article III standing).[2] Whether an unwanted communication comes

___

[2]I would not adopt the approach of the Seventh Circuit in Pucillo, where the court found unwanted debt-collection letters did not confer standing. See Pucillo, 66 F.4th at 640 ("[T]here is nothing inherently bothersome, intrusive, or invasive about a collection letter delivered via U.S. Mail."). As the dissent in that case pointed out, Pucillo's logic-which sought to distinguish letters from other intrusive communications, like text messages or phone calls-sounds more in degree than kind. See id. at 644 (Lee, J., dissenting). In an age when we can put phones on "Do Not Disturb," or employ "ringless voicemail," see, e.g., Dickson, 69 F.4th at 345, there

from a single text message, <u>Drazen v. Pinto</u>, 74 F.4th 1336, 1345 (11th Cir. 2023) (standing), five text messages, <u>Gadelhak</u>, 950 F.3d at 460, 462–63 (standing), a phone call and voicemail, <u>Lupia</u>, 8 F.4th at 1191–93 (standing), a single *ringless* voicemail, <u>Dickson</u>, 69 F.4th at 340, 345–46 (standing), or, as in Denmon's case, a single letter, <u>see</u> <u>Six</u>, 129 F.4th at 634 (standing), it causes the same sort of injury recognized at common law: a violation of the right to be left alone. Congress could "elevat[e]" it accordingly. <u>Ojogwu</u>, 26 F.4th at 462 (alteration in original) (noting that "Congress plays an important role" in standing "because, by statute, it may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law'" (quoting <u>Spokeo</u>, 578 U.S. at 341)).

Respectfully, I dissent.

———————————————————

---

appears to be no principled distinction for purposes of Article III between phone communications and unwanted physical mail. Nor would it be administrable to try to engage in line drawing as to the offensiveness of different unwanted communications. Like <u>Pucillo</u>'s dissent, and in line with the Ninth Circuit, I am "unpersuaded by th[e] distinction" the Seventh Circuit made. <u>Six</u>, 129 F.4th at 635 (rejecting <u>Pucillo</u>).