**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2371
_____

ELIZABETH PANZARELLA; JOSHUA PANZARELLA,
Individually and on behalf of all others similarly situated,
Appellants

v.

NAVIENT SOLUTIONS, INC.
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civil No. 2-18-cv-03735)
District Judge: Honorable Petrese B. Tucker
_____

Argued February 11, 2022
_____

Before: GREENAWAY, JR., SCIRICA, and RENDELL,
*Circuit Judges*.

(Filed: June 14, 2022)

James A. Francis
David A. Searles
Francis Mailman Soumilas
1600 Market Street
Suite 2510
Philadelphia, PA 19103

David P. Mitchell [**ARGUED**]
Maney & Gordon
101 East Kennedy Boulevard
Suite 1700
Tampa, FL 33602

Robert P. Cocco
Robert P. Cocco, P.C.
1500 Walnut Street
Suite 900
Philadelphia, PA 19102

*Counsel for Appellants*

Alan J. Butler
Megan Iorio
Christopher Frascella
1518 New Hampshire Avenue, N.W.
Washington, DC 20036

*Counsel for Amicus/Appellants*

Lisa M. Simonetti [**ARGUED**]
Greenberg Traurig

1840 Century Park East
Suite 1900
Los Angeles, CA 90067

Lindsay N. Aherne
Greenberg Traurig
1144 15th St.
Suite 3300
Denver, CO 80202

Joel M. Eads
Greenberg Traurig
1717 Arch Street Suite 400
Philadelphia, PA 19103

*Counsel for Appellee*

_____

OPINION OF THE COURT

_____

Rendell, *Circuit Judge*.

Elizabeth and Joshua Panzarella ("the Panzarellas") sued Navient Solutions, LLC ("Navient"), claiming that, among other things, Navient violated the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 (the "TCPA"). The Panzarellas assert that Navient called their cellphones without

their prior express consent using an automatic telephone dialing system ("ATDS") in violation of section 227(b)(1)(A)(iii) of the TCPA. The District Court granted summary judgment for Navient. It concluded that Navient's dialing technology did not qualify as an ATDS under section 227(a)(1) of the TCPA because it viewed a particular component of Navient's dialing technology as separate from its dialing system. As a result, it erred by failing to consider whether Navient's dialing "equipment" as a whole qualified as an ATDS. *Id.* Even though we do not decide whether Navient's dialing equipment qualified as an ATDS, we find that Navient did not *use* an ATDS in violation of the TCPA when it called the Panzarellas. Thus, we will affirm the District Court's order on this alternative ground.

I.

Navient serviced the student loans of Matthew Panzarella, Elizabeth's son and Joshua's brother. Matthew listed both his mother and brother as references on student loan applications and promissory notes and, in doing so, provided their cell phone numbers to Navient. Eventually, he became delinquent on his loans and failed to respond to Navient's attempts to communicate with him. In response, Navient contacted the Panzarellas. Call logs show that, over five months, Navient called the phone number alleged to belong to Elizabeth four times (three of which were unanswered, and one of which may have been answered) and the number alleged to belong to Joshua fifteen times (all unanswered).

During the relevant period, Navient used telephone dialing software developed by Interactive Intelligence Group,

4

Inc ("ININ"),[1] the "Interaction Dialer."  This software allows a user to "conduct[] campaigns" during which "calls are placed to contacts based upon information read from a contact list." App. 185.  For each campaign, the user may opt to use one of several dialing methods, which employ varying levels of automation.  For example, in "Preview" mode, call center agents initiate calls, while, in modes such as "Predictive" and "Power," the Interaction Dialer automatically dials telephone numbers.[2]

The Interaction Dialer cannot conduct campaigns on its own.  Instead, it "is deployed across servers and workstations that collectively make up the system."  App. 200.  Three servers are required: the Outbound Dialer Server, the Central Campaign Server, and a database server.  During a campaign these three servers work together to make and process outbound calls.  The Outbound Dialer Server makes the outbound calls, while the Central Campaign Server acts like an intermediary gathering data from and passing these data among the system's servers.  The database server, which "often runs on dedicated hardware" yet "can reside on the [Central Campaign Server]," contains "a set of database tables that are created and managed automatically by Interaction Dialer" and the customer-created "contact list."  App. 200, 203.  The Interaction Dialer relies on "external data sources for contacts [l]ists and campaign tables," and these tables "must be

---

[1] ININ now does business under the name Genesys Telecommunications Laboratories, Inc.

[2] During the relevant period, Navient used two customized versions of the Interaction Dialer, one with and one without the "Agentless," "Power," and "Predictive" dialing modes.  To call the Panzarellas, it used the latter version.

5

managed by a database management system," either Oracle RDBMS or Microsoft SQL Server.  App. 205.  Users may employ the Interaction Dialer's "Contact Import Wizard" to import contact data from their own sources or "create [their] contact tables manually."  App. 205, 209.

As is relevant here, in its configuration of the Interaction Dialer (the "ININ System"), Navient used a database server managed by Microsoft SQL Server (the "SQL Server").  The server performs two key functions for the ININ System.  First, it stores a list of numbers associated with student loan accounts that have specific attributes (e.g., type of loan, stage of delinquency).  Although the SQL Server can generate 10-digit random and sequential numbers in a ContactList table, all its stored telephone numbers "are pulled from Artiva," Navient's separate database of account information.  App. 123 ¶ 19.  Second, the SQL Server plays a role in outbound calling campaigns, relaying the stored telephone numbers to the ININ System's other servers to enable the System to dial them.

This appeal concerns whether Navient used the ININ System in violation of the TCPA.  The TCPA prohibits individuals from, among other things,

> mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . .—
>
> > (i) to any emergency telephone line . . . ;

6

> (ii) to the telephone line of any guest room or patient room of a hospital health care facility, elderly home, or similar establishment; or
>
> (iii) to any telephone number assigned to a paging service, cellular telephone service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to the United States[.]

§ 227(b)(1)(A). Under section 227(a)(1) of the TCPA, an ATDS is

> equipment which has the capacity—
>
> (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and
>
> (B) to dial such numbers.

The Panzarellas filed a putative class action complaint against Navient in the United States District Court for the Eastern District of Pennsylvania, alleging that Navient used an ATDS to call their and others' cellphones without their prior

express consent in violation of section 227(b)(1)(A)(iii) of the TCPA.[3] They sought injunctive relief and statutory damages under section 227(b)(3) of the TCPA as well as an award of attorneys' fees and costs on an equitable basis.[4]

Navient sought summary judgment, arguing, among other things, that the Panzarellas' "TCPA claims fail[ed]" because Navient did not call them "us[ing] an ATDS[.]" App. 62-63. It claimed it could not have done so as its ININ System did not qualify as an ATDS under section 227(a)(1) of the TCPA. It contended that, because this system lacked the capacity to generate random or sequential telephone numbers and then dial those numbers, it could not be an ATDS.[5]

The District Court granted summary judgment for Navient holding that Navient did not use an ATDS to place the calls at issue. It determined that Navient's ININ System lacked

---

[3] The Panzarellas defined the putative class as "[a]ll cellular telephone subscribers in the United States who from September 2012 to the present received an autodialed call from Navient on their cellular telephone without their prior express consent regarding a debt they did not owe." App. 31.

[4] The Panzarellas also alleged that Navient violated the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p (the "FDCPA"), which is not at issue on appeal. The District Court granted Navient's motion for summary judgment on these claims, finding that the Panzarellas had abandoned them.

[5] Navient also argued that, because the calls at issue were placed with human intervention, these calls were not made by an ATDS in violation of the TCPA. The District Court did not address this argument, and Navient has not raised it on appeal.

8

the necessary present capacity to store or produce telephone numbers using a random or sequential number generator. It reasoned, relying largely on the characterization of such a database server contained in the Interaction Dialer's manual, that the SQL Server was distinct from the ININ dialing system. Consequently, the District Court found that the Panzarellas had adduced "no evidence to suggest that the ININ dialing system *on its own* is an ATDS" and granted Navient's motion for summary judgment on the Panzarellas' TCPA claims. App. 10 (emphasis added).

The Panzarellas timely appealed their TCPA claims and seek reversal only of the District Court's grant of summary judgment for Navient on these claims.

## II.[6]

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1985). We review the order granting summary judgment, including the factual and legal questions, de novo. *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 255 (3d Cir. 2021). We "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 (3d Cir. 2016) (citation omitted). "We may affirm on any basis supported by the record, even if it departs from the

---

[6] The District Court had jurisdiction over the underlying putative class action under 28 U.S.C. § 1331. We exercise jurisdiction under 28 U.S.C. § 1291.

District Court's rationale." *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019).

## III.

## A.

The Panzarellas asserted that Navient violated section 227(b)(1)(A)(iii) by using an ATDS to call them without their prior express consent. As noted above, the District Court disagreed, concluding that Navient's dialing system, the ININ System, was not an ATDS as defined by section 227(a)(1). The District Court's conclusion, however, rested on its misinterpretation of the TCPA's ATDS definition, in particular the meaning of "equipment."

The TCPA requires that we consider the "equipment" that the defendant employs to conduct calling campaigns. § 227(a)(1). To determine how widely this term sweeps, "we look first to [the statute's] language, giving the words used their ordinary meaning." *Artis v. Dist. of Columbia*, 138 S. Ct. 594, 603 (2018) (citation omitted). For an undefined term such as "equipment," we seek to determine its plain meaning at the time of the TCPA's enactment. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020). At that time, equipment referred to the tools used to achieve a particular purpose or objective. *See, e.g.*, *Equipment*, Merriam-Webster's Dictionary of Law (1996) (defining equipment as "the implements used in an operation or activity"); *Equipment*, Black's Law Dictionary (6th ed. 1990) ("Furnishings or outfit for the required purposes. Whatever is needed in equipping; the articles comprised in an outfit; equippage."); *see also Equipment*, Black's Law Dictionary (11th ed. 2019) ("The articles or implements used for a specific purpose or activity (esp. a business operation).").

Accordingly, as ordinarily understood, equipment could constitute several discrete objects that, together, served a single purpose.

As "[s]tatutory language cannot be construed in a vacuum," we turn next to equipment's context. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 367 (2018) (alteration in original) (citation omitted). This context shows that Congress drafted the TCPA to regulate combinations of devices that, when used together, functioned as autodialers. Critically, Congress chose to regulate the use of "automatic telephone dialing *system*[*s*]." § 227(b)(1)(A) (emphasis added). By focusing on systems, it signaled that the TCPA would reach combinations of devices that operate together. *See System*, Black's Law Dictionary (6th ed. 1990) ("Orderly combination or arrangement, as of particulars, parts, or elements into a whole; especially such combinations according to some rational principle."). At the time, both Congress and the telemarketing industry understood this choice's consequences. *See* H.R. Rep. No. 101-633, at 6 (1990) (discussing industry concerns about the scope of the ATDS definition). Congress considered but declined to adopt language that would have limited the ATDS definition to certain types of dialing equipment. *Compare* § 227(a)(1) (defining ATDSs in terms of "equipment"), *with* H.R. 628 (1989) (defining autodialers in terms of "telephone terminal equipment"). *See Sandoval v. Reno*, 166 F.3d 225, 241 (3d Cir. 1999) (reasoning that Congress's decision to exclude proposed language from an earlier bill in the final bill confirmed the court's interpretation of the statute). Given the statute's remedial purpose, we have no difficulty concluding that Congress envisioned a broad understanding of "equipment." *See Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir.

11

2013) (relying on the TCPA's status as a "remedial statute" to confirm an interpretation of the statutory text).

The FCC's interpretations of equipment bolster our construction.[7]  *See Daubert v. NRA Grp., LLC*, 861 F.3d 382, 389-90 (3d Cir. 2017) (considering FCC rulings as part of its interpretation of the TCPA).  Since 2003, the FCC has interpreted the TCPA to regulate certain combinations of software and hardware. *Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14,014, 14,091-93 (2003) (determining predicative dialers qualified as ATDSs because "[t]he hardware, *when paired with certain software*, has the capacity to store or produce numbers and dial those numbers" (emphasis added)).  Recently, in 2015, it considered whether a dialing system composed of devices owned and operated by separate entities yet used together qualified as an ATDS. *Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7977-78 (2015).  In a portion of the ruling left intact by the D.C. Circuit, *see ACA*

---

[7] In *PDR Network, LLC v. Carlton & Harris Chiropractic*, the Supreme Court suggested that the FCC's interpretive rulings may not bind courts when they construe the TCPA.  139 S. Ct. 2051, 2055-56 (2019) (holding that it could not determine whether, under the Hobbs Act, a 2006 FCC order binds courts without resolving two preliminary questions).  For this reason, we, as our sister circuits have done, will treat such rulings as persuasive authority.  *Gorss Motels, Inc. v. Lands' End, Inc.*, 997 F.3d 470, 477 n.4 (2d Cir. 2021); *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 960 n.8 (8th Cir. 2019) ("We agree with the FCC not because we believe we are bound to do so but because we find this portion of their interpretation of the statute to be persuasive.").

*Int'l v. FCC,* 885 F.3d 687, 695 (D.C. Cir. 2018), the FCC determined that such "a combination of equipment" could constitute an ATDS as long as this "voluntary combination" meets the ATDS definition's requirements, *Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. at 7978. Emphasizing the statute's use of "system," it reasoned that the TCPA "contemplate[s]" that "various pieces of different equipment and software can be combined to form an [ATDS]." *Id.*

Equipment's ordinary meaning, its context, and the FCC's interpretation of the ATDS definition, then, all point to the same construction: an ATDS may include several devices that when combined have the capacity to store or produce telephone numbers using a random or sequential number generator and to dial those numbers.

Applying this construction here, we find that the District Court erred in holding that Navient's dialing system was not an ATDS because it viewed the SQL Server's capacities as distinct from the ININ System's. Navient relied on the SQL Server alongside the ININ System's other components to conduct dialing campaigns. This server not only stored the telephone numbers that Navient contacted during campaigns, but it also communicated with the ININ System's other servers, so the system could call them. Indeed, the Interaction Dialer's manual confirms that this dialer cannot conduct these campaigns without a database server, like the SQL Server. Navient points out that Microsoft rather than ININ developed the SQL Server, and this server resides on its own dedicated hardware. But this does not matter. As the TCPA requires us to consider whether all the devices employed together to conduct dialing campaigns constitute an ATDS, we conclude that Navient's "equipment" includes the SQL Server. Because

13

the District Court determined that Navient's dialing system was not an ATDS only after it excluded the SQL Server from this system, we cannot affirm the District Court's grant of summary judgment on these grounds.

## B.

Still, Navient insists that we should find that the ININ System, including the SQL Server, could not qualify as an ATDS under section 227(a)(1). It claims that, in its recent decision *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), the Supreme Court held that a dialing system "must *presently* and *actually use* a random and sequential telephone number generator" to qualify as an ATDS. Appellee's Br. 28-29 (emphasis in original). Navient contends that the record contains no evidence that the ININ System actually generated random or sequential telephone numbers, and, therefore, because it did not use an ATDS, it is still entitled to summary judgment.

We disagree. Both Navient and the concurrence seize on language in *Duguid*, claiming that it constitutes a holding that an ATDS must actually use a random or sequential number generator. But that is not the case. The issue before the Court was quite different. In *Duguid*, the Supreme Court interpreted the TCPA's ATDS definition to resolve a circuit split between the Second, Sixth, and Ninth Circuits on one side and our Court, the Seventh, and Eleventh Circuits on the other. 141 S. Ct at 1168 & n.4. The former group held that the phrase "using a random or sequential number generator" modifies "produce" but not "store." *Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 283-84, 287 (2d Cir. 2020); *Allan v. Pa. Higher Educ. Assistance Agency*, 968 F.3d 567, 579-80 (6th Cir. 2020); *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1053 (9th

14

Cir. 2018). The latter, on the other hand, determined that it modifies both "produce" and "store." *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018); *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 468 (7th Cir. 2020); *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1306 (11th Cir. 2020). Relying primarily on its understanding of section 227(a)(1)'s syntax and its application of the series-qualifier canon, the Court adopted the latter group's construction of the TCPA, holding that, "[t]o qualify as an [ATDS,] a device must have the *capacity either* to *store* a telephone number using a random or sequential generator *or* to *produce* a telephone number using a random or sequential number generator." *Duguid*, 141 S. Ct. at 1167, 1169-70 (emphasis added).

The opinion's imprecise use of language ultimately provides no support for Navient's assertion that the Court held that, to qualify as an ATDS, the equipment "must not only have a present capacity to generate random or sequential numbers and then dial them, it must [also] actually *use* that generator." Appellee's Br. 19 (emphasis in original). Although the Court restated the full ATDS definition—including "capacity"—when it summarized its holding, 141 S. Ct. at 1168; *id.* at 1173 ("We hold that a necessary feature of an [ATDS] under § 227(a)(1)(A) is the *capacity* to use a random or sequential number generator to either store or produce phone numbers to be called." (emphasis added)), in other places, it described the ATDS definition in terms of the "use" of a random or sequential number generator, *e.g.*, *id.* at 1170 ("In sum, Congress' definition of an autodialer requires that in all cases, whether storing or producing numbers to be called, the equipment in question must *use* a random or sequential number generator." (emphasis added)); *id.* at 1171 ("The statutory context confirms that the autodialer definition excludes

15

equipment that does not '*us*[*e*] a random or sequential number generator.'" (emphasis added) (quoting § 227(a)(1)(A)). Yet, these inconsistent statements, in their context, say nothing about whether an ATDS must *use a random or sequential number generator* or *have the capacity to use a random or sequential number generator*. Indeed, this issue was not even before the Court. *Id.* at 1168 (viewing the issue before it as limited to resolving the circuit split regarding whether "using a random or sequential number generator" modified "produce" but not "store"). Rather, the Court employed this language to explain that "using a random or sequential number generator" modifies "store" and "produce."[8] That was the issue before it. *See Borden v. United States*, 141 S. Ct. 1817, 1833 n.9 (2021) (plurality opinion) ("'[T]he language of an opinion,' we have stated, 'is not always to be parsed as though we were dealing with the language of a statute.' And that is most obviously true

---

[8] The concurrence contends that, through such language, the *Duguid* Court demonstrated that its analysis went beyond resolving the question of whether "using a random or sequential number generator" modifies both "produce" and "store." In particular, it claims that the Court's explanation of the potential ramifications of a broad ATDS definition proves the point. We disagree. The precise question before the Court invited consideration of these consequences. The Court observed that ordinary smartphones would qualify as ATDSs if an ATDS need only be capable of storing and dialing telephone numbers, as the Ninth Circuit had held below, *id.* at 1168, 1171, so it reasoned that, rather than have the capacity to merely store telephone numbers, it must have the capacity to store them "using a random or sequential number generator," § 227(a)(1)(A).

16

when an opinion's language revises (for easier reading) the statute's own. Better to heed the statutory language proper." (alteration in original) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979))). Therefore, *Duguid* does not stand for the proposition that a dialing system will constitute an ATDS only if it actually generates random or sequential numbers.[9]

---

[9] Even if *Duguid* could be read to suggest that section 227(a)(1) requires an ATDS to actually use a random or sequential number generator, we would consider these statements dicta that do not bind us. *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 548 (2013); *Singh v. Uber Techs. Inc.*, 939 F.3d 210, 223 (3d Cir. 2019). Moreover, although "we pay due homage to the Supreme Court's *well-considered* dicta as pharoi that guide our rulings," these dicta, if we accept Navient's reading of them, do not merit such treatment as they would then conflict with the section 227(a)(1)(A)'s plain meaning. *IFC Interconsult, AG v. Safeguard Int'l Partners, LLC.*, 438 F.3d 298, 311 (3d Cir. 2006) (emphasis added) (declining to follow a dictum it determined was "hardly a well-considered dictum"). *Cf. Kirtsaeng*, 568 U.S. at 548 (declining to afford weight to a dictum from a previous opinion and noting that "we are not necessarily bound by dicta should more complete argument demonstrate that the dicta [are] not correct").

The concurrence suggests this reading of *Duguid* is well considered, but it makes little effort to square this interpretation of section 227(a)(1) with the statutory text or our holding in *Dominguez.* It argues that an actual-use requirement does not conflict with section 227(a)(1)'s use of "capacity" because it views "'[c]apacity' [as] a prerequisite to 'use.'" Concurring Op. I. n.3. Section 227(a)(1)'s text, however, cannot bear such a construction. The phrase "using a random

Instead, under section 227(a)(1), whether "equipment" qualifies as an ATDS turns on that equipment's "capacity" to employ a random or sequential number generator to store or produce telephone numbers, not its actual use of a such a generator. § 227(a)(1). We have held that, for a dialing system to qualify as an ATDS, it need only have the "present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers." *Dominguez*, 894 F.3d at 119, 121; *see also King v. Time Warner Cable*, 894 F.3d 473, 481 (2d Cir. 2018) (adopting a similar interpretation of "capacity"); *ACA Int'l*, 885 F.3d at 696 (explaining that whether a particular function is a "capacity" of that device turns on the significance of the modification needed to employ that function). Here, there is conflicting evidence in the record

---

or sequential number generator" modifies the phrase "to store or produce telephone numbers to be called," which, in turn, modifies "capacity." "[U]sing a random or sequential number generator," thus, refers to how an ATDS must be capable of storing or producing telephone numbers. So, if we were to decide whether Navient's dialing system qualifies as an ATDS, section 227(a)(1), as we held in *Dominguez*, 894 F.3d at 119, 121, would require us to consider whether the equipment in question has the present capacity to employ random- or sequential-number generation "to store or produce telephone numbers to be called[.]" And, as we note, based on the record before us, we cannot answer that question.

Perhaps, the Supreme Court might interpret section 227(a)(1)'s use of "capacity" differently when a case provides the occasion for it to do so, but, at this moment, that prospect is not enough for us to discard *Dominguez*. *See Rehkop v. Berwick Healthcare Corp.*, 95 F.3d 285, 291 (3d Cir. 1996).

concerning the "present capacity" of the entire ININ System (inclusive of the SQL Server) to employ random- or sequential-number generation to store or produce telephone numbers. For this reason, we cannot hold that ININ System does or does not qualify as an ATDS.[10]

## IV.

While the District Court erred in granting summary judgment based on whether the ININ System qualified as an ATDS, summary judgment may still have been properly granted if we find the record makes clear that, when Navient called the Panzarellas, it did not "make [these calls] . . . *using* any [ATDS]." § 227(b)(1)(A) (emphasis added). That is so because a violation of section 227(b)(1)(A)(iii) requires proof that the calls at issue be made "using" an ATDS. This issue turns not on whether Navient's dialing equipment was an ATDS but on whether Navient violated the TCPA when it employed this dialing equipment to call the Panzarellas.[11]

---

[10] Although the District Court did not address this issue, we will not remand the case for it do so because we can resolve this appeal on alternative grounds.

[11] We may affirm the District Court's decision on these different grounds even though the parties have not focused on this issue. "[O]ur adversarial legal system generally adheres to the principle of party presentation," under which parties frame the issues before the court. *Guerra v. Consol. Rail Corp.*, 936 F.3d 124, 132 & n.5 (3d Cir. 2019). Nevertheless, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply

"As in any statutory construction case, [w]e start, of course, with the statutory text, and proceed from the understanding that [u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (alterations in original) (internal quotation marks and citation omitted). We, then, must consider how an ordinary person would understand the phrase "making any call . . . *using any* [*ATDS*]." § 227(b)(1)(A) (emphasis added); *see Watson v. United States*, 552 U.S. 74, 79 (2007) (interpreting a statute's use of "use" in accordance with its ordinary understanding when this term was undefined).

This inquiry gets us only so far for *use* is an "elastic" term with a range of possible meanings. *Smith v. United States*, 508 U.S. 223, 241-43 (1993) (Scalia, J., dissenting) (listing a few of *use*'s varied definitions). For example, in *Smith*, the Justices, relying on different understandings of the ordinary meaning of *to use an object or instrument*, adopted different interpretations of the phrase to "use[] . . . a firearm" in 18 U.S.C. § 924(c)(1) (Supp. II 1990), which imposed "specified penalties if the defendant, 'during and in relation to any crime of violence or drug trafficking crime[,] uses or carries a firearm.'" *Id.* at 227-28 (majority opinion) (alteration in original). On the one hand, Justice Scalia reasoned that, consistent with the ordinary meaning of *to use an instrument*, an individual *used a firearm* within the meaning of the statute when it used it for its intended purpose, namely as a firearm. *See id.* at 242-44 (Scalia, J., dissenting). Writing for the majority, Justice O'Connor, on the other hand, adopted a

the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

20

broader reading of *to use a firearm* that would allow a broader range of uses (such as "pistol-whip[ping]") based not only on the plain meaning of *use* but also on the context of the surrounding statutory provisions. *See id.* at 228-37 (majority opinion).

We encounter a similar predicament here. As the D.C. Circuit observed in *ACA International* in considering the possible interpretations of section 227(b)(1)(A)'s phrase "using any [ATDS]," when an ATDS has

> the "capacity" both to perform the autodialer functions set out in the statutory definition and to perform as a traditional phone, does the bar against "making any call using" an ATDS apply *only to calls made using the equipment's ATDS functionality*? Or does the bar apply to *all calls made with a device having that "capacity," even ones made without any use of the equipment's autodialer capabilities*? Or does the bar apply to *calls made using certain autodialer functions, even if not all of them*?

885 F.3d at 704 (emphasis added) (declining to resolve this question when the petitioners did not challenge an interpretation of section 227(b)(1)(A)'s language). Faced with this conundrum, we must seek "to give effect to Congress's intent." *United States v. Tyson*, 947 F.3d 139, 144 (3d Cir. 2020) (internal quotation marks and citation omitted). In most

21

instances, we rely on the statute's plain language "[b]ecause we presume that Congress' intent is most clearly expressed in the text of the statute." *Hagans v. Comm'r of Social Sec.*, 694 F.3d 287, 295 (3d Cir. 2012) (internal quotation marks and citations omitted); *see also CTS Corp. v. Waldburger*, 573 U.S. 1, 12 (2014) ("Congressional intent is discerned primarily from the statutory text."). Yet, "[w]here," as here, the "statute's language is arguably not plain," we look beyond the statutory text to ascertain Congress's intent, "consider[ing] [the] statutory language in the larger context or structure of the statute in which it is found" and its "legislative history as an aid or cross-check." *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 95 (3d Cir. 2018) (internal quotation marks and citations omitted). Here too, the statute's context, purpose, and legislative history help us to interpret section 227(b)(1)(A) as Congress intended. When we rely on these aids to inform our understanding of the statutory text, we see that Congress employed *use* in a narrow sense in section 227(b)(1)(A), namely, to use an ATDS for its autodialing functionalities.

Starting with the context of the phrase "using any [ATDS]," we look to section 227(b)(1)'s other prohibitions. *See Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (interpreting "use" "in its context and in light of the terms surrounding it"); *United States v. Diallo*, 575 F.3d 252, 258-60 (3d Cir. 2009) (relying on the term's context to interpret the meaning of "use" within a statute). As the Sixth Circuit recognized in *Ashland Hospital Corp. v. SEIU*, where it considered section 227(b)(1)(D)'s meaning, all four of these provisions, despite focusing on different conduct, "regulate[] first-order-contact between automated calls and the unwilling recipients of such calls[.]" 708 F.3d 737, 743 (6th Cir. 2013). So, when interpreting them,

"the appropriate touchstone . . . is the actual receipt of an unwanted automated telephone communication." *Id.*

A narrower construction of *use* hews to this touchstone by focusing section 227(b)(1)(A)'s prohibition on calls that employ ATDSs as autodialers. By contrast, we would cast it aside if we adopted a broader construction. Under such a construction, liability would turn on whether the relevant dialing equipment had the required capacities not whether the defendant employed these capacities to make automated calls. The statutory context shows that the latter inquiry must inform the scopes of 227(b)(1)'s provisions. *Cf. id.* at 739-40, 743-44 (reasoning that a union did not "use an [ATDS]" in violation of section 227(b)(1)(D) when it conducted an automated calling campaign that played individuals a recorded message, prompted them to contact a hospital executive by pressing one on their phones, and connected the individuals who did so with that executive's direct line because it did not employ the automated process to make the calls that tied up the hospital's phone lines). Thus, this contrary result counsels against the broader construction and in favor of the narrower one. *See Nielsen v. Preap*, 139 S. Ct. 954, 970-71 (2019) (rejecting a construction of a statute that would produce "anomalies").

We know Congress was concerned with the use of ATDS as autodialers because the TCPA proscribes only a few specific uses of ATDSs. *Mims v. Arrow Fin. Servs, LLC*, 565 U.S. 368, 373 (2012) (explaining the TCPA proscribes calls made using an ATDS to emergency numbers, hospital patients, and cellphone and pager numbers; residential telephones without the recipient's consent; and the use of an ATDS to tie up more than one telephone line of a business at the same time). It crafted these prohibitions with autodialing's harms in mind. *Duguid*, 141 S. Ct. at 1171. Congress enacted the TCPA in

23

response to "[v]oluminous consumer complaints about abuses of telephone technology[.]" *Mims*, 565 U.S. at 370-71. Yet, it "found autodialer technology to be uniquely harmful" as these devices could tie up the phone lines of businesses and emergency services and impose costs on randomly dialed cellphone users. *Duguid*, 141 S. Ct. at 1167.

Of course, at the highest level of generality, "Congress passed the TCPA to protect individual consumers from receiving intrusive and unwanted calls." *Daubert*, 861 F.3d at 389 (quoting *Gager*, 727 F.3d at 268). Even so, the legislative history makes clear that it did not do so "to make all unsolicited telemarketing or facsimile advertising illegal." H.R. Rep. No. 102-317, at 6 (1991). Such blunt legislation would have, in fact, frustrated Congress's aims. *See* Telephone Consumer Protection Act of 1991, Pub. L. 102-243, § 2(9), 105 Stat. 2394, 2394 (recognizing that "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices"). Rather, in committee reports, Congress explained that the TCPA's prohibitions targeted "autodialed calls." S. Rep. No. 102-177, at 9 (1991) (explaining the bill "would ban all autodialed calls, and artificial or prerecorded calls, from being made to emergency lines and paging and cellular phones"); S. Rep. No. 102-178, at 10 (1991) (summarizing the restrictions as "ban[ning] all autodialed calls, and artificial or prerecorded calls, to emergency lines and paging and cellular phones"); *see also* H.R. Rep. No. 102-317, at 6. Put differently, it "meant to use a scalpel" to address specific harms autodialing caused. *Duguid*, 141 S. Ct. at 1171.

Despite the text's lack of clarity, Section 227(b)(1)(A)'s context and legislative history establish that Congress drafted

24

this statute to prohibit making calls that use an ATDS's autodialing functionalities.

This construction leaves us with another question to resolve: what does it mean to make a call using an ATDS's autodialing functionalities? Here, the TCPA's definition of an ATDS proves illuminating. It shows that, at its core, autodialing is the "product[ion] or stor[age] of telephone numbers to be dialed, using a random or sequential number generator." § 227(a)(1). After all, without the capacity to perform one of these functions, a dialing system cannot qualify as an ATDS. *Id.* We already reached this conclusion implicitly in *Dominguez* when we explained that the TCPA defined an ATDS based on its "present capacity to *function as an autodialer by generating random or sequential telephone numbers* and [to] dial[] those numbers." 894 F.3d at 121 (emphasis added); *see also ACA Int'l*, 885 F.3d at 696, 704 (describing these same capabilities as "autodialer features" and "autodialer functions"). More recently, in *Duguid*, the Supreme Court determined that an ATDS's defining feature was its ability to employ random or sequential number generation to produce or store telephone numbers. 141 S. Ct. at 1170-71. Therefore, to use an ATDS as an autodialer, one must *use* its defining feature—its ability to produce or store telephone numbers through random- or sequential-number generation.

What is more, when we interpret "making any call . . . using any [ATDS]" to mean *making any call using any ATDS's ability to use a random or sequential number generator to produce or store telephone numbers*, § 227(b)(1)(A), we give effect to both the TCPA's definition of an ATDS and its targeted prohibitions. *See Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (noting that courts interpret statutory language "with a

25

view to [its] place in the overall statutory scheme" (citation omitted)).  Congress has structured other consumer protection legislation similarly, such as   the FDCPA, another statute enforceable through a private right of action.  *See Barbato v. Greystone All., LLC*, 916 F.3d 260, 264-65 (3d Cir. 2019).  As a "threshold requirement," an FDCPA claim must concern a "debt," which the Act broadly defines as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment," 15 U.S.C. § 1692(a)(5).  *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898 F.3d 351, 358 (3d Cir. 2018) (quoting *Zimmeran v. HBO Affiliate Grp.*, 834 F.2d 1163, 1167 (3d. Cir. 1987)).  After this threshold, the FDCPA narrows: an individual may obtain damages only when certain proscribed practices are employed to collect debts.  *See* 15 U.S.C. §§ 1692c-1692f, 1692k; *Heintz v. Jenkins*, 514 U.S. 291, 292-93 (1995); *see also Douglass v. Convergent Outsourcing*, 765 F.3d 299, 303 (3d Cir. 2014) (noting that a plaintiff, among other things, must establish "the defendant has violated a provision of the FDCPA in attempting to collect [a] debt" "[t]o prevail on an FDCPA claim").

Congress's decision to rely on a similar structure when drafting the TCPA makes sense.  At the time of the TCPA's enactment, autodialers worked in a variety of ways.  *See* Noble Systems Corp., *Comments in Response to the FCC's Request for Comments on the Interpretation of the TCPA in Light of the Ninth Circuit's Decision in* Marks v. Crunch San Diego, 10-12, WC Docket Nos. 18-152 & 02-278, FCC DA 18-1014 (Oct. 16, 2018), available at

https://www.fcc.gov/ecfs/file/download/DOC-599f9ebe18c00000-A.pdf?file_name=Noble_System_Comments_FCC_DA18-1014_FINAL.pdf (discussing various autodialer patents issued in the years before the TCPA's enactment). Moreover, Congress understood not only that telemarketers could transform ordinary computers into autodialers through minor and inexpensive modifications, *The Automated Telephone Consumer Protection Act of 1991: Hearing on S. 1462 before the Sen. Subcomm. on Commc'ns of the Comm. on Commerce, Sci., and Transp.*, 102d Cong. 18 (1991) [hereinafter *1991 Senate Hearing*] (testimony of Robert S. Bulmash), but also that they were increasingly relying on computerized databases containing telephone numbers during their dialing campaigns, H.R. Rep. No. 102-317, at 7-8 (describing the increasing reliance on computerized databases for telemarketing and noting that the industry has responded with markets for such software, lists of consumer data, and guides on how to make the best use of these tools). The TCPA's statutory design fit (and continues to fit) this shifting technological landscape. *See 1991 Senate Hearing*, *supra*, at 19 (testimony of Robert S. Bulmash) (discussing the telemarketing industry's increasing use of "predictive dialers"). A broad definition of an ATDS based on a dialing system's "capacity" ensured that telemarketers could not evade all TCPA scrutiny at the outset through arguments about how their precise systems operate. The narrow prohibitions balanced the definition's breadth, imposing liability only when those telemarketers used their

dialing systems to cause the harms the TCPA sought to eliminate.[12]

A simple hypothetical illustrates how sections 227(a)(1) and 227(b)(1)(A) work together. Imagine Junk Call Corp. employs a dialing system with a switch that allows Junk Call to make calls in one of two modes: "automatic," in which the system dials random or sequential telephone numbers, and "list," in which the system dials the telephone numbers imported from Junk Call's customer list. This dialing system qualifies as an ATDS because it has the present capacity to

---

[12] The concurrence questions the wisdom of this statutory framework, contending that Congress could have achieved the same result by narrowing the definition of an ATDS. While that may be so, Congress understood the consequences of such an approach. In fact, the FCC explained that such an approach could "curtail innovation" or "eliminate legitimate telemarketing operations." *1991 Senate Hearing*, *supra*, at 54 (testimony of Alfred C. Sikes, Chairman, FCC) ("If all uses of a given class of equipment are publicly detrimental a statutory prohibition on its use might be warranted. The record does not show, however, that *all existing or potential uses* of *all automatic dialing machines* are detrimental. There is thus a risk that a practical, although unintended consequences of these bills might be to curtail innovation, or to eliminate legitimate telemarketing operations." (emphasis added)).

Besides, even if we believe that a different statutory design could better achieve the TCPA's ends, we are not empowered to improve Congress's work. *See United States v. Safehouse*, 985 F.3d 225, 238-39 (3d. Cir. 2021) (declining to adopt an interpretation that would require the court "to rewrite the statute").

produce random telephone numbers and then dial them. *See Dominguez*, 894 F.3d at 119-20, 120 n.23. A broad construction of "using any [ATDS]" (i.e., section 227(b)(1)(A) prohibits any call made with the assistance of an ATDS) would mean that Junk Call would violate the TCPA when it conducts calling campaigns in either automatic mode or list mode. Under the narrower construction (i.e., section 227(b)(1)(A) proscribes calls that employ an ATDS's capacity to generate random or sequential numbers), Junk Call's automatic-mode calls alone would give rise to TCPA liability.

Only the latter reading gives effect to Congress's intent in enacting the TCPA. Because Junk Call dials random or sequential numbers only when it employs automatic mode, automatic-mode calls, but not list-mode calls, threaten the harm the TCPA targets—telemarketing "that risks dialing emergency lines randomly or tying up all the sequentially numbered lines at a single entity." *Duguid*, 141 S. Ct. at 1171. Congress would have little reason to expose Junk Call to liability for its list-mode calls as these calls do not present these risks. If we interpreted section 227(b)(1)(A) to proscribe calls where an ATDS has not used its number-generation capabilities, then we "would take a chainsaw to the[] nuanced problems" Congress intended to remedy. *Id.* Heeding the Supreme Court's advice, we read section 227(b)(1)(A) to protect Americans from a particular type of harm as Congress intended (and drafted). *See id.* Thus, we hold that, for a call to violate section 227(b)(1)(A), that call must employ either an ATDS's capacity to use a random or sequential number generator to produce telephone numbers to be dialed or its capacity to use a random or sequential number generator to store telephone numbers to be dialed.

Here, the Panzarellas' claims fail because the record establishes that Navient did not rely on random- or sequential-number generation when it called them. Even if we assume that the ININ System, through the SQL Server, had the capacity to generate lists of random or sequential telephone numbers and was thus an ATDS, Navient did not use the ININ System in this way. Instead, it selected a dialing campaign's potential targets from "specific, curated borrower lists." App. 124 ¶ 22. These lists contained contact information drawn from Navient's internal database of account information rather than computer-generated number tables. Consequently, the lists that served as the basis for its calling campaigns contained "specific numbers associated with [Navient's] student loan accounts." App. 125 ¶ 30.

When it placed the calls at issue, Navient drew the Panzarellas' cellphone numbers from such a list. The Panzarellas have identified no evidence that even suggests Navient called them in anything but a targeted manner. This, of course, makes sense. Navient wanted to speak specifically to the Panzarellas because Matthew's loans had become delinquent.[13] Besides, what reason would Navient have to call phone numbers unrelated to borrowers' accounts when following up on delinquent loans?

At bottom, as the record contains no evidence that Navient used the ININ System to randomly or sequentially produce or store the Panzarellas' cellphone numbers and therefore no evidence that Navient made a telephone call *using*

---

[13] Despite disputing precisely why Navient contacted the Panzarellas, the parties agree that the calls all stemmed from Matthew's delinquent loans.

30

an ATDS in violation of the TCPA, Navient is entitled to summary judgment on the Panzarellas' TCPA claims.

## V.

Because, even if Navient's ININ System qualified as an ATDS under the TCPA, there is no genuine issue of material fact as to whether Navient called the Panzarellas' cellphones without their consent "using an[] [ATDS]" in violation of section 227(b)(1)(A)(iii) of the TCPA. We will therefore affirm the District Court's grant of summary judgment on these alternate grounds.

GREENAWAY, JR., *Circuit Judge*, concurring in the judgment.

While I respect my colleagues' position and agree with the decision to affirm,[1] I disagree on the fundamental question we must resolve. According to the majority, that question is: was Navient Solutions, Inc. ("Navient") using an automatic telephone dialing system ("ATDS") under 47 U.S.C. § 227(b)(1)(A)? In my view, the fundamental question is: what is an ATDS under § 227(a)(1)? I would hold that a dialing system must *actually use* a random or sequential number generator to store or produce numbers in order to qualify as an ATDS under § 227(a)(1). Because Navient's dialing system did not do so, it is not an ATDS, and Navient is entitled to summary judgment.

I.

Initially, we cannot skip to § 227(b)(1)(A)—the issue of whether a call was made using an ATDS—without first identifying a reasonable interpretation of ATDS under § 227(a)(1). The key inquiry is whether an ATDS refers to: (1) equipment that has the *capacity* to store or produce numbers using a random or sequential number generator, but does not currently use the generator; or (2) equipment that *actually uses* a random or sequential number generator to store or produce

---

[1] I also agree with the majority's conclusion that the SQL Server should be considered as part of the "equipment" that constitutes Navient's dialing system. The District Court erred in treating the SQL Server as discrete from the ININ System. Nonetheless, I would affirm on the alternative ground that Navient's dialing system does not qualify as an ATDS.

1

numbers. I would conclude that the latter interpretation controls.

Under § 227(a)(1) of the Telephone Consumer Protection Act ("TCPA"), an ATDS is

> equipment which has the capacity—
> (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and
> (B) to dial such numbers.

47 U.S.C. § 227(a)(1).

Recently, the Supreme Court resolved a circuit split as to whether the clause "using a random or sequential number generator" in § 227(a)(1)(A) modified only the verb that immediately precedes it ("produce") or both preceding verbs ("store" and "produce"). *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021) ("*Duguid*"). In doing so, it indicated that equipment's "use" of a number a generator—rather than its mere "capacity" to use a generator—is a defining feature of an ATDS.

In *Duguid*, the Court considered whether Facebook violated the TCPA by sending automated text messages to numbers associated with Facebook accounts any time those accounts were accessed by an unrecognized number. *Id.* at 1168. Importantly, Facebook merely stored numbers associated with the accounts—it did not store or produce the numbers using a random or sequential number generator. *Id.* Reasoning that "using a random or sequential number generator" modifies both "store" and "produce" in § 227(a)(1)(A), the Supreme Court held that Facebook's

2

system did not qualify as an ATDS because it did not use a random or sequential number generator. *Id.* at 1170. Put differently, dialing numbers from a stored list was insufficient. *Id.*

Writing for the Court, Justice Sotomayor asserted: "Congress' definition of an autodialer requires that *in all cases*, whether storing or producing numbers to be called, *the equipment in question must use a random or sequential number generator.*" *Id.* (emphasis added). In my view, this indicates that the mere capacity to use a number generator is insufficient for equipment to constitute an ATDS.

Admittedly, whether the requirement that equipment must actually "use" a number generator is part of *Duguid's* holding as opposed to dicta is equivocal.[2] *Compare id.* ("in all

---

[2] The majority argues that *Duguid* stands only for the proposition that "using a random or sequential number generator" modifies both preceding verbs. But instead of ending its analysis there, the Supreme Court went further. It asserted: "Congress defined an autodialer in terms of what it must do ('store or produce telephone numbers to be called') and *how it must do it* ('*using a random or sequential number generator*')." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021) (emphasis added).

Indeed, if capacity was the test, the Supreme Court would not have cautioned against the unreasonable implications of broadly interpreting ATDS to include "any equipment that merely stores and dials telephone numbers." *Id.* at 1171. As the Supreme Court observed, that approach "would capture virtually all modern cell phones" and impose liability on

3

cases . . . the equipment . . . must use a . . . number generator") *with id.* at 1173 ("We hold that a necessary feature of an autodialer under § 227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called"). Nonetheless, where, as here, the Supreme Court has offered its "well-considered" guidance on the precise issue that we confront, that guidance—dicta or not—warrants our attention. *IFC Interconsult, AG v. Safeguard Int'l Partners, LLC.*, 438 F.3d 298, 311 (3d Cir. 2006) ("we pay due homage to the Supreme Court's well-considered dicta as pharoi that guide our rulings").

Construing § 227(a)(1) as requiring an ATDS to actually use a random or sequential number generator is consistent with the purpose of the TCPA, which targets autodialed calls that employ a number generator. *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013) (citing S. Rep. 102-178, at 5 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1972). By contrast, treating equipment with the mere capacity to use a number generator as ATDSs would be over-inclusive. If Congress meant to prohibit autodialed calls, then why include dialing systems that do not actually use a number generator in the definition of ATDS?

At bottom, the broad definition of ATDS articulated by the majority in this case is inconsistent with the concerns animating *Duguid*. The majority agrees that Congress' intent

"ordinary cell phone owners in the course of commonplace usage, such as speed dialing or sending automated text message responses." *Id.* Accordingly, a narrower construction of ATDS is appropriate.

4

was to stop autodialed calls; however, the majority broadly construes ATDS in § 227(a)(1) to encompasses equipment with the mere *capacity* to store or produce numbers using a generator, even if it does not actually use that generator. Then, to effectuate Congress' intent, the majority narrows the scope of the TCPA on the back end. Specifically, it interprets § 227(b)(1)(A) as proscribing only those calls that are made *using* a generator. In this way, it corrects the problem it created in the first step. This holding creates a precarious framework where many dialing systems may qualify as an ATDS, but the use of only *some* of those ATDSs would violate the TCPA: namely, when an entity places an unwanted call using an ATDS that stores or produces numbers *using* a generator. Accordingly, I would adopt a narrower definition of ATDS requiring actual use of a random or sequential number generator.[3]

Further, I am not persuaded that the majority's approach is necessary for addressing dialing systems that can switch between placing calls using automatic mode ("which dials random or sequential numbers") and list mode ("which dials the telephone numbers imported into [an entity's] customer list"). Majority Op. 22. In the majority's view, these dialing

---

[3] To be clear, treating "use" as dispositive in § 277(a)(1) does not write out the term "capacity" as the Panzarellas suggest. Quite the contrary. "Capacity" is a prerequisite to "use." If a dialing system lacks the capacity to do what is proscribed by the statute, the inquiry would end there—there would be no need to consider whether the system is using its capacity. Alternatively, if a device satisfies the "capacity" threshold inquiry, then we would move onto the "use" issue.

5

systems qualify as ATDSs—either way the switch is flipped—because they have the present capacity to generate random telephone numbers and then dial them. *See Dominguez v. Yahoo*, 894 F.3d 116, 119-20, 120 n.23 (3d Cir. 2018). However, only the calls made using automatic mode would violate the TCPA, as the calls made using list mode do not "threaten the harm the TCPA targets—telemarking 'that risks dialing emergency lines randomly or typing up all sequentially numbered lines at a single entity.'" Majority Op. 22 (citing *Duguid*, 141 S. Ct. at 1171).

But if the goal is to prohibit only the autodialed calls, why should we construe § 227(a)(1) of the TCPA as covering the list mode at all? We can reach the same result and target the same evils under a narrow definition of ATDS—one that requires actual use of a generator to store or produce numbers. Under the narrow definition, the described dialing system qualifies as an ATDS and is subject to the TCPA when it places calls in automatic mode. As soon as it switches to list mode, the dialing system ceases to be an ATDS because it no longer poses the concerns that Congress meant to mitigate.

II.

Even considering the SQL Server as part of the ININ System, I would hold that Navient's dialing system is not an ATDS. Navient's dialing system does not currently store or produce numbers using a random or sequential number generator—and the Panzarellas do not argue otherwise. In its current configuration, the SQL Server merely stores a list of numbers associated with student loan accounts that have specific attributes (*e.g.*, type of loan, stage of delinquency). Then, the numbers are uploaded to the ININ System to initiate a calling campaign.

6

That the SQL Server could be reconfigured to use a random or sequential number generator does not render Navient's dialing system an ATDS. *Duguid* instructs that Section 277(a)(1) regulates actual use, not potential. Given the nature of Navient's loan business and its corresponding need to contact specific debtors and their references, it is difficult to articulate a reason why Navient would use a random or sequential number generator.

Because I do not think that Navient's dialing system qualifies as an ATDS, I would not reach the issue of whether Navient made calls "using any [ATDS]" under § 277(b)(1)(A)(iii), upon which the majority relies.